## Chatfield et al. v. Board of Revision of Taxes

*Charles J. Biddle* and *Thomas Stokes*, for appellants.

*Joseph H. Lieberman*, assistant city solicitor, and *Francis F. Burch*, city solicitor, for board of revision of taxes.

BOK, P. J., November 17, 1941.—This is an appeal from an assessment for the year 1941 in the sum of $440,000 against 50 acres of land in what the city's expert described as "the highest residential neighborhood in the City of Philadelphia." It is interesting to observe that, while the assessors have valued the property as high as $634,000, the present assessment by the board of revision of taxes has remained undisturbed since 1924.

Mrs. Henry, who had a life estate in the property, died in 1938, and it is now being administered as part of the estate of her father. All the main buildings have been torn down, and the heirs are trying to dispose of the land, thus far unsuccessfully.

### Discussion

It is elementary in this type of case that there is a presumption of regularity which protects the assessment and throws upon the owners the burden of showing it to be inequitable. It is my view that the burden has been met and that relief is proper.

No such case as this can be decided by precise formula. The ultimate basis for decision can be only the opinion of those who are considered expert from having dealt for years in real estate and who know general or particular facts about the property and the neighborhood. Some knowledge of current social and economic conditions is also helpful. Appellants' two experts are of the opinion that this property could not be sold at all unless it were broken up and "developed". They approach the problem in terms of use, and it appears from their testimony that they have arrived at their valuation of $200,000 on the basis of best possible use, namely, as what they call a land development; this means running roads through the property, installing sewer, light and power services, grading, and dividing the tract into smaller units for sale and building. In this I think they have the common sense of it,

and it was interesting to hear Mr. Kidd, the city's expert, agree with them. On page 47 he said this:

"By the Court:

Q. Mr. Kidd, I think I would like to know why you think a larger piece of land won't bring as much as a smaller piece.

A. Because this piece of land no doubt would have to be developed, depending upon what happens to it. That I don't know.

Q. In other words, saleability depends upon its development?

A. Yes.

Q. It does? You don't think that a block of 50 acres in a lump could sell?

A. No, I don't think it would sell.

Q. You would have to break it up?

A. Yes—that is, if it came into a sub-division. Of course, that isn't the only thing that could happen to this land. You might put a very large apartment on here, the same as was done at Alden Park Manor. They bought 20 acres, then bought 12 more. They have 32 acres down there."

Having testified to this effect, Mr. Kidd at once goes on to say that in making his own valuation he did not take development costs into consideration. This is where I think he goes astray. His reasons are twofold, so far as I can gather them: First, the neighbors, who also have large holdings nearby and are related by marriage to the heirs here, wouldn't permit the land to be sold for such purposes; and secondly, a land development would ruin the neighborhood. It is true that an expert must deal in intangibles, but I don't consider these to be the right intangibles; the first reason seems to fall before the heirs' determined efforts to sell, as testified to by Mr. Biddle, and as for the second, it is not clear what Mr. Kidd means by "ruin". His real basis for valuation is other sale prices in the vicinity, greatly diluted by his testimony that small lots fetch

more than large ones; his prices of $9,000 and $7,000 per acre for level land and ravine land, respectively, are so reduced from the other sale prices he mentioned that they are of little help. The Chestnut Hill Academy transaction was a wash sale to help finance the school and so is of no benefit whatever. The other sales involve land obviously improved or accessible to improvements and are not precedent for any part of appellants' land except the portion that abuts upon existing roads; the rest, in the interior of the tract, would have to be opened up to road and utility services before they could be comparable to the other sales mentioned by Mr. Kidd, and this shows the force and wisdom of basing value on use as a real estate development.

As all the experts seem to be agreed on this principle, I prefer the realistic approach to actual value based on probable cost before the vaguer approach of an arbitrary assignment of price per acre based on factors which Mr. Kidd himself admits distinguish this large tract from the smaller ones he mentioned. The latter method was carried to absurd lengths by Mr. Terry, the assessor, who testified: "Well, this assessment was set by my predecessors back in 1924. They assessed it at $10,000 an acre, and I allowed it to remain." Granted that the cost of development includes intangible elements that call for arbitrary estimates, I believe it more intelligently reflects the trend of contemporary events since 1924 than does evidence which seems to me to reflect the view that little if any change in conditions has occurred since then.

The city has advanced certain objections and made certain points:

1. It is contended that when testifying in chief a real estate expert must be silent the instant he has given his estimate of value, and must refrain from stating his reasons, unless he gives them first. It is then up to the cross-examiner to develop the reasons if he chooses. If he doesn't, the court is presumably left

hanging in the air with a figure unexplained. While such a strict rule of procedure may have some weight when the case is heard by a jury, it seems to have none when the court sits alone. This whole method of determining value is so difficult and uncertain that the court should have the benefit of every proper scrap of evidence and explanation, and whether A is adduced before B or B before A, granted both are admissible, doesn't seem to matter very much. The city cites McSorley v. Avalon Borough School District, 291 Pa. 252 (1927). This was a jury case heard on appeal from the award of a jury of view and does not appear to substantiate the procedural artifact for which the city contends. The court said, inter alia (p. 254) :

"The witnesses on each side were asked, in chief, not only the market value of the property in its entirety, at the time of the taking, but also how they made up that value; and each gave the value of the land, the house, and the garage, as separate items, the sum of the three being the amount alleged by the witness to be the market value of the property. This was improper. Witnesses may testify as to that which tends to give value to a property, including buildings or anything else on or under it, which a proposed purchaser would probably consider in determining whether or not he would buy it; but the testimony, in chief at least, must be limited to the property in its entirety, as it was at the time of the taking: Searle v. Lackawanna, etc., R. R. Co., 33 Pa. 57; Reading, etc., R. R. v. Balthaser, 119 Pa. 472; Penna., etc., R. R. Co. v. Cleary, 125 Pa. 442; Kossler v. Pittsburgh, etc., Ry. Co., 208 Pa. 50; Hamory v. Penna., etc., R. R. Co., 222 Pa. 631; Kleppner v. Pittsburg, etc., R. R. Co., 247 Pa. 605. This case well illustrates the wisdom of the rule just stated; for the average juryman would naturally reason that, if the undisputed replacement value was $75,000, the market value of $39,499.50, as fixed by the lowest of plaintiff's witnesses, must be substantially correct, and

this latter sum, with six per cent damages for detention,—as the court below points out, though the force of the calculation was apparently not noticed, — is nearly the same as the verdict of $41,406.31.

"After an expert witness has been examined and cross-examined as to his competency, and has, in addition, been so interrogated as to show fully the extent of his knowledge regarding the value of the property taken, in order that the jury may be able to determine what weight shall be given to his testimony, the only other questions in chief should be as to his opinion of the value of the property, in its entirety, before and after the taking."

The city's objection to the reasons given by Messrs. Emlen and Priestman for their values was not based upon their general inadmissibility or irrelevance, but solely upon the point of order of proof.

2. The city asserts that appellants are bound by the assessor's testimony that the property was undervalued for years, and cites The Pennsylvania Company's Appeal, 282 Pa. 69 (1925). The following extract from the opinion in that case appears to answer the contention (p. 77):

"It was proper to elicit from the only one who knew, except his associate expert, the consideration which entered into the making up of the estimates. The fact that this might be followed by the testimony of other witnesses, contradicting the statements he might make, or the conclusions drawn therefrom, did not render the examination incompetent. 'It is true, as a general rule, a party cannot be permitted to impeach the veracity of his own witness, yet he may disprove the facts to which his witness has testified': P. R. R. Co. v. Fortney, 90 Pa. 323, 328. 'The mere fact of calling a witness does not mean that the party thereby admits as true everything the witness may say, and he is not estopped from proving the facts to be otherwise by other evidence': Henry on Trial Evidence, 434."

3. It is contended that Mr. Biddle's testimony showing the efforts of the estate to sell was inadmissible, and The Pennsylvania Company's Appeal, supra, is again cited. The opinion may similarly be used in refutation (p. 76) :

"In the present case, the question to be solved was the determination of the amount which the land would bring at an honest sale. The efforts to dispose of it for $55,000, both privately and publicly, furnished some indication of its market value, upon which the tax assessment must necessarily be based. The holding price of other lands similarly situated may be the basis of an estimate of worth. With like reason that of the property in question should be taken into consideration."

I am not aware of any case which holds that other sale prices in the neighborhood are conclusive and that, when they are once given, no other factors can be considered. In the instant case I regard those advanced by Mr. Kidd as of small effect, in view of all the circumstances and for the reasons given above. Nor has any case been brought to my notice which forbids the consideration of possible uses to which property can be put. The authorities rather open the door to all relevant elements that may be involved: The Pennsylvania Company's Appeal, supra; Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners, 229 Pa. 460 (1911) ; Edmonds' Appeal, 314 Pa. 382 (1934) ; American Academy of Music Appeal, 321 Pa. 433 (1936). In the Edmonds case, the court said:

"In reaching this value, that court considered everything that had a tendency to affect market value. There were no actual sales of similar property, and the court recognized that the land might have had a market value for a given use and purpose differing from other uses and purposes. This follows the general rule with respect to valuation of property in many situations where value is in question.

"There was erected on the premises a building for factory purposes, which could no longer be employed in such use. To prevent waste or destruction because of non-use, it was necessary to change the structure to fit it for other uses; this could be accomplished only by the expenditure of a large sum of money and by reducing its former usable area. Such factors should enter into a determination of its fair market value for assessment purposes, and the court below considered these factors as elements."

It is my opinion that appellants have presented a reasonably intelligent and workable basis of value, founded on use in the light of conditions as they are. This carries the burden against the assessment, which I regard as being founded on factors which are out of line with reality and do not disclose actual market value.

In conclusion, it might be prudent to add an obvious word of caution. This case involves a property whose former use has ceased. Not only do the owners no longer live there but they have torn down the mansion and have to all intents and purposes abandoned it to whatever use the market may have for it. The owner who applied for relief while still living in his home and thus continuing the use of the property would be in very different case. And should the development of the property before me actually occur, the city will be in position to review the situation of each separate residence resulting from it. Until that is done, however, the present owners are entitled to an assessment based on the best possible use and reflecting the cost of realizing it.

### Order

And now, November 17, 1941, the assessment on 7700 Cherokee Avenue, Philadelphia, is fixed at the sum of $201,000 for the year 1941. Costs to be paid by the city.

*Opinion sur exceptions*

BOK, P. J., February 20, 1942.—Reading the trial judge's opinion, we believe it answers the questions now raised before us en banc by the city. Some additional comment, however, is in order.

1. The city tentatively suggests that the evidence of the cost of a possible land development was based on hearsay. We think it sufficient to remark that this point was not made at the trial, the sole reason for the city's objection being based on the ground that an appellant's witness to value may not explain his reasons for his figure once he has given it. It might have been more desirable had a knowledgeable person from Wallace & Warner, who made a development plan, been called to demonstrate it, but he wasn't, and no objection was made to Mr. Emlen's testifying that he used the plan in making his valuation, and that he had studied the plan himself.

The city continues to take refuge in McSorley v. Avalon Borough School District, 291 Pa. 252 (1927). Its position is that were an expert witness to be asked, immediately after being qualified, what his valuation of the property was, he could not be asked anything more whatsoever, and that the development of his reasons for the figure must depend upon the cross-examiner. The danger of this rule is illustrated in the instant case, for the trial judge asked counsel for the city whether he would bring out the witness' reasons on cross-examination. Counsel replied that he might or he might not. He, therefore, claims the right to leave the court with nothing more than a bare figure which might hide an illegal or capricious chain of reasoning, such as erecting a glue factory or establishing a duck farm on the property. Since even the McSorley opinion says that "No other evidence is as unsatisfactory as that necessarily received in this class of cases," we believe that even if it were applicable to tax assessment cases generally, and we do not think it is, the McSorley case

should be limited to its own peculiar facts, which are that the evidence sought to be justified concerned the replacement value of the house and garage located on the condemned property.

The city believes the trial judge erred in referring to the McSorley rule as a procedural artifact, and labors the difference between rules of procedure and rules of evidence. We think it is a question of the order of proof, as the trial judge also said, but even if it were a question of evidence "which demonstrates, makes clear, or ascertains the truth", the McSorley rule as interpreted by the city would do anything but demonstrate or make clear. We cannot believe it is error for a trial judge to have the reasons for an expert witness' opinion of value.

2. The city contends that before an opinion as to use may be admissible there must be evidence of demand for the use, and cites Whitcomb v. Philadelphia, 264 Pa. 277 (1919), which undoubtedly sustains the contention. We do not believe, however, that its facts are congruous. Whitcomb v. Philadelphia was a land damage case and involved a tract of unimproved property whose value its owner sought to show was in its possible use as a manufacturing plant. There was evidence showing the industrial character of adjoining properties and other factors which the court found upheld the owner's contention. A definite use was sought to be given a property which had none. In the instant case the property has been residential for years. It is true that its use as an individual's home has ceased; the owner is dead and the heirs have tried in every way they could to sell. But its fundamental purpose as a place where people can live remains, the only change being that the evidence shows it to be a place whose reasonable marketability depends upon many people living where one did before.

Aside from this, there is, it seems to us, sufficient evidence of at least potential demand. The city's posi-

tion is weakened greatly by Mr. Kidd's acknowledgment that the property's marketability depends upon its development. The difference between his view and that of appellants is one of size and value of the houses contemplated in the development.

That evidence of other uses can be shown is evident in the case of Pennsylvania Company for Insurances on Lives, etc., v. Philadelphia, 268 Pa. 559 (1920), where the court said (p. 564) :

"The court again erred in striking out the testimony of one Hoffecker. It was in evidence that this property was desirable for hotel purposes, being within a short distance of Broad Street Station, at the intersection of three street car lines—an attractive hotel site. Plaintiff submitted a point, calling for an increased value if the jury found the site was especially adapted for a hotel. Hoffecker investigated the property about the time the appropriation was made, in 1906, intending to use it for hotel purposes. He thus testified and stated the market value for that purpose. The court should have permitted his testimony to stand."

3. The city asserts that the evidence given of the cost of a land development is too speculative to be accepted. It objects particularly to Mr. Emlen's statement that his value is "a conscientious guess" and that he would "have to sharpen his pencil and get some improvements eliminated". In a sense any expert's opinion is only a conscientious guess in evening clothes, and even the most detailed and studied plan of a prospective development cannot escape all conjecture. Mr. Kidd's conscientious guess, colored by five-year old sales and what can only be a "feel" as to market value, is of no greater demonstrable weight.

The city overlooks the fact that appellants' case does not rest wholly on the development plan. Mr. Priestman said this:

"In arriving at that valuation I took into consideration all the sales that I had made, tried to make, or

knew about, many other appraisals that I had made in other parts of Germantown and Chestnut Hill, and I came to the conclusion that on an acreage basis it was worth $4000 an acre. Then I tried to prove my conclusion by other methods."

This shows that Mr. Priestman used the same method of evaluation that Mr. Kidd did and then checked it by estimated development costs. The trial judge chose to accept Mr. Priestman's result rather than Mr. Kidd's. Since there is competent evidence to support his conclusion, we see no clear error which alone would operate to overturn it: American Academy of Music Appeal, 321 Pa. 433 (1936) ; Westbury Apartments, Inc., Appeal, 314 Pa. 130 (1934).

The other questions raised by the city appear to us to have been adequately dealt with by the trial judge.

The exceptions are dismissed.